IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH A. LONDO, | ) | CASE NO. 3:15-cv-01523 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Elizabeth A. Londo ("Plaintiff" or "Londo"), acting *pro se*,[1] seeks judicial

review of the final decision of Defendant Commissioner of Social Security ("Commissioner")

denying her application for social security disability benefits. Doc. 1, Doc. 5. This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).[2] This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

On December 29, 2015, Londo filed her Pro Se Social Security Brief. Doc. 20. On

March 14, 2016, Defendant filed her Brief. Doc. 23. On April 12, 2016, Londo filed Petitioner's

Pro Se Motion for Objection and Strike Defendants Brief and Demand for Remand According to

Federal Law. Doc. 24. Defendant is entitled to file a brief in support of her position in this

---

[1] At the administrative level, Londo was represented by non-attorney representatives. *See e.g,* Tr. 111, 132, 139-140, 205, 209

[2] In addition to arguing that this Court has jurisdiction under 42 U.S.C. § 405(g), Londo argues that jurisdiction exists and/or requests relief under other statutes, including 28 U.S.C. § 1331 (Federal Question); 5 U.S.C. §§ 702-703 (Administrative Procedure Act); and 28 U.S.C. § 2201 (Declaratory Judgment Act). Doc. 5. Since this Court has jurisdiction to decide Londo's administrative appeal under 42 U.S.C. § 405(g) it is not necessary to address whether jurisdiction or relief may be awarded under those statutes. *See e.g.,* *Truijillo v. Schweiker*, 558 F.Supp. 1058, 1061 (D. Colo. 1983) ; *Holden v. Heckler*, 584 F.Supp. 463, 484-485 (N.D. Ohio 1984); *Power Mobility Coalition v. Leavitt*, 2005 WL 3312962, * 9, FN 9 (D.C. 2005).

appeal. Doc. 6. Accordingly, Londo's motion to strike Defendant's Brief (Doc. 24) is
**DENIED**. While Londo's motion to strike has been denied, the undersigned has considered the
arguments presented in Londo's motion (Doc. 24) as her reply brief.

For the reasons stated below, the undersigned recommends that the Court **AFFIRM** the
Commissioner's decision.

## I. Procedural History

Londo protectively filed[3] her application for disability insurance benefits on June 26,
2012. Tr. 15, 78, 94, 219-220, 262. She alleged a disability onset date of March 14, 2010. Tr.
15, 219, 262. In May 2013, Londo amended her alleged disability onset date to November 11,
2011. Tr. 15, 239, 316. Londo alleged disability based on bulging disc, degenerative disc
disease, spinal stenosis, and anxiety. Tr. 66, 113, 265. After denials by the state agency (Tr.
113-121, 129), Londo requested a hearing (Tr. 130-131).

Through her representative, on April 30, 2013, Londo requested that a decision be
rendered on the record. Tr. 139-140. On July 2, 2013, Administrative Law Judge Sandra R.
DiMaggio Wallis ("ALJ Wallis") issued a fully favorable decision without a hearing. Tr. 95-
103. ALJ Wallis found that Londo had the RFC to perform a full range of sedentary work and
that based on that RFC and "considering claimant's age, education, and work experience, a
finding of 'disabled' is directed by Medical-Vocational Rule 201.14."[4] Tr. 95-103. ALJ Wallis
concluded that Londo had been under a disability since November 11, 2011, the amended alleged

---

[3] The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application." http://www.socialsecurity.gov/agency/glossary/ (last visited 6/10/2016).

[4] The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix
2 (the "Grid"). The Grid is composed of Rules 200.01-204.00. *Id.* The Grid includes rules that may be applied in
cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable
impairment from doing vocationally relevant past work. 20 C.F.R. § 404.1569.

disability onset date.  Tr. 103.  On August 30, 2013, the Appeals Council notified Londo that it intended to review ALJ Wallis's July 2, 2013, decision.[5]  Tr. 167-172.  In its notice to Londo, the Appeals Council advised Londo that it planned to send her case back to an ALJ for further action and a new decision because the Appeals Council concluded that substantial evidence did not support ALJ Wallis's decision, including the finding that Londo was limited to sedentary work.[6]  Tr. 168-170.  Londo was provided the opportunity to provide more evidence or a statement about her case.  Tr. 170.  In response, Londo submitted additional evidence regarding three office visits with one of her physicians between April 2, 2013, and September 6, 2013.  Tr. 107.  On February 26, 2014, under the authority of 20 C.F.R. § 404.977, the Appeals Council vacated the July 2, 2013, decision, finding that substantial evidence did not support ALJ Wallis's finding, that Londo was limited to sedentary exertion work and had no skills that would transfer to other occupations, and remanded the case to an ALJ for further proceedings.[7]  Tr. 105-110.

Pursuant to the Appeals Council's order of remand, ALJ Thomas L. Wang ("ALJ Wang" or "ALJ") held a hearing on May 30, 2014.  Tr. 35-65.  Thereafter, on July 16, 2014, ALJ Wang issued his decision.  Tr. 12-34.  ALJ Wang determined that Londo had not been under a disability from November 11, 2011, though the date of the decision.  Tr. 27.  Londo requested review of ALJ Wang's decision by the Appeals Council.  Tr. 9-11.  On June 17, 2015, the Appeals Council denied Londo's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

---

[5] When notified of ALJ Wallis's fully favorable decision, Londo was advised that "[t]he Appeals Council may review my [ALJ Wallis's] decision even if you [Londo] do not appeal."  Tr. 96.

[6] The Appeals Council explained in detail its basis for intending to remand the case for further proceedings.  Tr. 168-170.

[7] The Appeals Council issued a 5-page opinion in which it reviewed the evidence, including reports from Londo's treating and examining physicians.  Tr. 105-109.

### A. Personal and Vocational Evidence

Londo was born in 1961.  Tr. 26, 219.   At the time of the May 30, 2014, hearing, Londo was married with two adult children.  Tr. 39.  She is a high school graduate.  Tr. 40.  Londo's past work includes work as a housekeeper in a hospital.  Tr. 48.  She worked in that capacity for about seven months.  Tr. 48.  She was unable to continue working in the position of housekeeper because she was unable to lift the loads of laundry, which were between 18 and 25 pounds, and unable to flip the mattresses to clean them.  Tr. 48-49.  Before working in the hospital, Londo worked in a family business installing aftermarket items on cars.  Tr. 49.  She primarily pinstriped cars, which involved cleaning a car off and applying a pinstripe down the side of the car.  Tr. 49-50.  She also assisted her brother with installation of aftermarket parts, e.g., spoilers on sports car.  Tr. 50.

### B. Medical Evidence[8]

### 1. Medical records

Lumbar spine x-rays taken on May 20, 2011, showed that Londo had a grade 5 spondylolisthesis at L5-S1, with complete spondyloptosis at the lumbosacral junction.  Tr. 322. Based on the May 20, 2011, x-rays, Londo's primary care physician Rene Shelly, D.O., indicated that it appeared that Londo's 5th lumbar vertebra, or part of it, had slid back, which was likely putting a lot of pressure on some of her spinal nerves.  Tr. 322.  Thus, Dr. Shelly recommended an MRI.  Tr. 322.

During an August 3, 2011, visit with Nurse Practitioner Caroline Dawson, Nurse Dawson noted "mild back pain problems."  Tr. 341.

---

[8] Londo alleged disability based on both physical and mental impairments.  However, the arguments raised by Londo in this case pertain to her physical impairments.  Accordingly, the evidence summarized herein relates primarily to Londo's physical impairments.

On March 7, 2012, Londo underwent an MRI of her lumbar spine.  Tr. 323-324, 402.
The symptoms noted were lower back pain and bilateral leg pain.  Tr. 323.  The MRI showed:
(1) "grade IV spondylitic spondylolisthesis of L5 on S1 with moderate to severe central spinal
stenosis and severe left as well as moderate right L5-S1 neural foraminal narrowing[;]" (2) "mild
facet joint degenerative changes throughout the lumbar spine[;]" and (3) "slight disc bulge L4-5
without significant spinal stenosis[.]"  Tr. 324.  A CT of Londo's lumbar spine was taken on
June 20, 2012.  Tr. 334.  The impression was: "1. Bilateral L5 pars defects, grade 3
anterolisthesis at L5-S1 with severe spondylosis and vertebral body fusion.  Severe canal stenosis
and bilateral neural foraminal narrowing at this level. 2. Chronic T11 compression fracture."  Tr.
334.

On April 5, 2012, Londo saw Nurse Dawson for a check-up and medication refills.  Tr.
338-339.  Londo reported no complaints or problems.  Tr. 338.  Nurse Dawson indicated that
Londo's past medical history included chronic headaches, situational anxiety, and GERD.  Tr.
338.  Nurse Dawson assessed migraines (primary), insomnia, and anxiety.  Tr.  338.

On May 29, 2012, Jason Lee Schroeder, M.D., of Neurological Associates of NOW, saw
Londo for a consultation.  Tr. 332-333. Londo described having some pain in her neck but
complained mostly that, when lying down at night, she had numbness and tingling going into
both legs.  Tr. 332.  She reported experiencing those symptoms for about six months and having
chronic back pain for many years.  Tr. 332.  Londo also reported having weakness in her arms
and legs and some more recent bowel urgency.  Tr. 332.  On physical examination, Dr.
Schroeder observed a palpable lump at the lumbosacral junction that Dr. Schroeder indicated was
most likely at the detached L5 spinous process.  Tr. 332.  Dr. Schroeder noted that Londo could
lie down and sit up.  Tr. 332.  Londo had good strength in her legs and she had no sensory deficit

during the examination. Tr. 332. Dr. Schroeder's assessment was that Londo had almost complete spondyloptosis at L5-S1. Tr. 333. Dr. Schroeder was not certain that Londo should have surgery. Tr. 333. He recommended a CT scan in order to evaluate the bony anatomy and to make sure that the L5 had not fused to the front of the sacrum. Tr. 333.

During a June 26, 2012, visit with treating physician Salim Hanna, M.D., Londo complained of a pounding headache. Tr. 336-337. Londo reported no tingling or numbness and no weakness. Tr. 336. On examination, Dr. Hanna observed tenderness of the cervical spine and deformity of the lower lumbar spine. Tr. 337. Dr. Hanna also observed normal strength and sensation. Tr. 337. Dr. Hanna's assessment was neck pain (primary), cephalgia, and sinusitis acute. Tr. 337.

On September 17, 2012, Londo saw Selvon F. St. Clair, M.D., of the Orthopedic Institute of Ohio-Lima, with complaints of lower back pain, bilateral leg numbness, neck pain and bilateral arm numbness. Tr. 353-354. Londo indicated that activities that aggravated her pain included sitting, standing, walking, lying on her back, rising from a sitting position, coughing, and driving. Tr. 353. Lying on her side and changing positions relieved her pain. Tr. 353. Flexiril, tramadol, and Vicodin provided Londo with mild relief. Tr. 353. Londo had not undergone physical therapy, she had not had epidural injections, and she had no prior spinal surgeries. Tr. 353. Londo reported no bladder or bowel dysfunction. Tr. 353. On physical examination, Dr. St. Clair observed a normal gait. Tr. 353. Londo was not using an assistive device to ambulate. Tr. 353. Dr. St. Clair observed tenderness in the lumbar spine and a "step off in the lower spine." Tr. 353. Londo had full lumbar range of motion except she was limited with extension. Tr. 353. Londo had full cervical range of motion. Tr. 353. Londo's upper and lower extremity sensation was intact bilaterally and she had normal strength bilaterally. Tr. 353-

354.  Her reflexes were symmetrical.  Tr. 354.  She had negative clonus, negative Babinski, negative straight leg raise, negative Hoffman's and negative Spurling's sign.  Tr. 354.  Dr. St. Clair's assessment was: spinal stenosis of lumbar region, with neurogenic claudication; spondyloarthritis lumbosacral; spondyloarthritis cervical; cervical radiculitis; L5-S1 spondyloptosis; L5-S1 neural foraminal stenosis; L5 bilateral spondylolysis; and cervical spondylosis with radiculopathy.  Tr. 354.  Dr. St. Clair recommended that Londo have an L4-S1 posterior spinal fusion.  Tr. 354.  Dr. St.Clair noted that Londo "would not like to proceed with surgery at this time.  The patient would like to have disability, however, she would have to have a surgery to see if this could provide her with relief of her lower back pain and bilateral leg pain."  Tr. 354.  Londo was prescribed tramadol to provide her some relief for her symptoms and would return to Dr. St. Clair's office on an as needed basis.  Tr. 354.

On October 22, 2012, Londo saw Dr. Hanna for shortness of breath and an upper respiratory infection.  Tr. 370-371.  Dr. Hanna observed normal physical examination findings, including normal range of motion of the spine.  Tr. 370.  Londo exhibited normal strength proximally and distally in all four extremities.  Tr. 370.  Dr. Hanna noted no back pain, no joint pain, no joint stiffness, no joint swelling, and no neck pain.  Tr. 371.  He assessed shortness of breath and bronchitis.  Tr. 371.

On January 11, 2013, Londo saw Dr. Hanna for medication refills and with complaints of back pain.  Tr. 368-369.  Londo reported that her back pain was chronic and moderate.  Tr. 368.  On examination, Dr. Hanna observed normal range of motion in the spine.  Tr. 369.  Also, Londo exhibited normal strength proximally and distally in all four extremities.  Tr. 369.  Dr. Hanna assessed chronic back pain (primary) and adjustment disorder.  Tr. 369.

Londo saw Dr. Hanna on April 2, 2013, with complaints of low back pain and hip pain that was getting worse.  Tr. 378-379.  Dr. Hanna noted that surgery had been recommended but Londo was reluctant to proceed with surgery.  Tr. 378.  On examination, Dr. Hanna observed limited flexion in the L-S spine and some tenderness in paraspinous muscles lower lumbar spine. Tr. 378.  Otherwise, examination findings were normal.  Tr. 378.  Dr. Hanna assessed chronic back pain for which he prescribed Vicodin to be taken as needed.  Tr. 378.  Dr. Hanna also assessed anxiety.  Tr. 378.  Londo saw Dr. Hanna on August 22, 2013, for medication refills.  Tr. 376-377.  Londo indicated that she needed a refill of her pain medication that she was taking to control her lower back pain associated with her severe spondylolisthesis of the L5-S1.  Tr. 376. Londo reported that she was continuing to have pain when lying down and occasional numbness in her leg down into her toes.  Tr. 376.  Londo was having radicular symptoms in her lower extremities.  Tr. 376.  Dr. Hanna noted that Londo was "on Disability now mainly due to back issue."  Tr. 376.  Dr. Hanna observed normal range of motion of spine and normal strength proximally and distally in all four extremities.  Tr. 377.  Dr. Hanna recommended that Londo follow up in three months regarding her chronic back pain.  Tr. 377.

On September 6, 2013, which was two days after her knee popped and she had fallen down, Londo saw Dr. Hanna.  Tr. 373-375.  Londo's knee was swollen and Londo reported that it was painful to walk.  Tr. 373.  Londo reported no back pain.  Tr. 373.  On examination, Dr. Hanna observed normal range of motion of the spine.  Tr. 374.

Londo saw Dr. Hanna on January 30, 2014, for back pain, neck pain, numbness in her toes and refills.  Tr.  388-389.  Londo reported that she continued to have problems with low back pain, with some fluctuations in severity.  Tr. 388.  On examination, Dr. Hanna observed normal range of motion of spine.  Tr. 388.  He noted a bony mass at L-3 level – 1.5 inch x 1 inch

in size.  Tr. 388.  Dr. Hanna assessed chronic back pain, neuropathy, radiculopathy, and anxiety.
Tr. 389.  Dr. Hanna encouraged Londo to accept evaluation and surgical intervention regarding
her low back pain but Londo refused to do so.  Tr. 389.

Londo saw Dr. Hanna again on March 4, 2014, with continued complaints of back pain.
Tr. 386-387.  Londo described her pain as persistent, with occasional sharp shooting pain.  Tr.
386.  She experienced numbness and tingling down both legs with her left toe being constantly
numb.  Tr. 386.  Londo indicated that she had pain with sitting for prolonged periods of time and
had to change positions – lie down or walk around to alleviate her pain.  Tr. 386.  Dr. Hanna's
examination revealed a bony protrusion of the L-S spine that corresponded to spondylolisthesis;
difficultly with toe-heel walk; deformity of MP joints in both hands with hyperflexion of all
digits; limited flexion of L-S spine to 90 degrees; and very limited extension of the lumbar spine.
Tr. 387.  Dr. Hanna assessed low back pain (primary); radiculopathy; joint hyperextensibility of
multiple sites; and degenerative joint disease at multiple sites.  Tr. 387.  Dr. Hanna
recommended imaging for low back pain, radiculopathy, and degenerative joint disease.  Tr. 387.

On March 12, 2014, an MRI of Londo's lumbar spine was taken.  Tr. 382-383.  A
comparison was made to the MRI of March 7, 2012.  Tr. 382.  The impression was that Londo's
lumbar spine had a very similar appearance as before with Grade 4 spondylolisthesis of L5 on S1
and secondary stenosis of the canal and foramina at that level.  Tr. 383.  There was less
impressive narrowing at other levels.  Tr. 383.  There was a likely developmental variant of the
T11 vertebral body and diffuse mild facet degenerative changes were redemonstrated.  Tr. 383.

In addition to treatment for her back, beginning in March 2009 and continuing through
April 2014, Londo received periodic chiropractic treatments at Jicha Chiropractic for her neck.
Tr.  390, 395-398.

## 2.  Medical opinions

### a.  Treating physicians

#### *Dr. Shelly*

On July 19, 2012, Dr. Shelly completed a questionnaire regarding Londo's medical conditions. Tr. 325-326.  She indicated that she first saw Londo on May 20, 2011, and last saw her on April 27, 2012.  Tr. 325.  Dr. Shelly indicated that Londo had the following clinical abnormalities and/or gross anatomical deformities: Grade 5 spondylolisthesis at the L5-S1– 5th lumbar vertebrae does not even sit on the top of her sacrum – very severe.  Tr. 326.  Dr. Shelly indicated that it was her opinion that Londo "actually functions surprisingly well [and] has so all her life for the degree of deformity in her back.  The potential for disability is very great."  Tr. 326.  When asked to describe Londo's motor loss, sensory deficit, muscle weakness, reflex abnormalities, muscle spasms, muscle atrophy, or symptoms of radiculopathy, Dr. Shelly indicated that, "Right now her motor loss isn't that great, mild weakness.  Actually has greater pain up into the neck.  Has numbness when lays down, which is new."  Tr. 326.  Dr. Shelly also indicated that Londo "really doesn't have severe [symptoms] – just the potential for [symptoms].  Can't do heavy labor, but could do office work.  Can't do factory line work.  Probably shouldn't do work where she stands all day."  Tr. 326.

#### *Dr. Hanna*

On April 16, 2014, Dr. Hanna authored a letter indicating that he had treated Londo since 2004.  Tr. 399.  He noted that Londo had a long and extensive history of complaints of pain in the back, lower and mid, with decreasing range of motion.  Tr. 399.  Dr. Hanna also noted a history of abnormal MRIs of the back; a history of bilateral hand pain and decreased range of motion and use of her hands; and a history of abnormal x-rays and lab results demonstrating

positive titers for Rheumatoid Arthritis. Tr. 399. Dr. Hanna indicated that Londo had deteriorating symptoms for years and, at different times, difficulty with range of motion and complaints of pain. Tr. 399. Dr. Hanna indicated that he supported Londo's filing for physical disability. Tr. 399.

Also, on April 16, 2014, Dr. Hanna completed a check-box style form wherein he indicated that Londo's pain was severe such that it precluded her ability to maintain attention and concentration required for even simple, unskilled work tasks. Tr. 400. Dr. Hanna also opined that Londo's pain was disabling to the point of preventing her from working full-time even at a sedentary position. Tr. 400.

### b. Consultative examining physician

On December 10, 2012, Londo underwent a consultative orthopedic evaluation, which was conducted by B.T. Onamusi, M.D. Tr. 357-363. Londo reported that she is able to sit and stand for about 30 minutes at a time, walk 1-2 blocks and lift up to 15 pounds occasionally. Tr. 362. Londo reported having pain in her back when bending and said that she could do limited housework, laundry, and grocery shopping (leaning on a cart). Tr. 362. Londo indicated that she was able to do personal grooming activities and drive. Tr. 362. She had no problems using hands for gross or fine motor tasks but reported that her fingers, especially the middle fingers, lock from time to time. Tr. 362. Dr. Onamusi's physical examination revealed that Londo's muscle power and tone were normal in all muscle groups, reflexes in the ankles, knees, elbows and wrists were 2+ symmetrical; ankle clonus was absent; Babinski sign was negative, bilaterally; sensation to touch and pain was preserved in all extremities; vibration sense and proprioception was intact in all extremities; Romberg sign was negative and there were no cerebellar or extrapyramidal signs. Tr. 362-363. Also, Dr. Onamusi observed that Londo

walked with a normal gait; had no trouble transferring onto or off the examination table; she did

not require use of an assistive device; she had difficulty squatting more than half way down; she

was able to stand on heels and toes; she could grip and grasp with both hands; she could reach

forward, push or pull with upper extremities.  Tr. 363.  Also, examination of Londo's back

showed a symmetrical spine with restricted motion in the spine.  Tr. 363.  There was diffuse

moderate tenderness along the lumbar paraspinal muscles.  Tr. 363.  There were no paraspinal

muscle spasms.  Tr. 363.  Straight leg raise was negative bilaterally.  Tr. 363.

     Dr. Onamusi assessed:

1.  Chronic lower back pain, secondary to degenerative disease, grade 3
    anterolisthesis, spinal stenosis and severe spondylosis of the veterbral bodies.

2.  Hyperextension deformity involving fingers in both hands, probably
    degenerative in nature.

Tr. 363.  Dr. Onamusi opined that Londo would "have difficulty engaging in more than

sedentary to light physical demand level activities as defined in the Dictionary of Occupational

Titles."  Tr. 363.

### c.  State agency reviewing physicians

     On August 22, 2012, state agency reviewing physician Elaine M. Lewis, M.D.,

completed a physical RFC assessment.  Tr. 73-74.  She opined that Londo could lift/carry 20

pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour

workday; sit for about 6 hours in an 8-hour workday; and push and/or pull unlimitedly except for

lift/carry limitations.  Tr. 73.  Dr. Lewis also opined that Londo would be limited to frequently

climbing ramps/stairs; occasionally stooping, kneeling, crouching, and crawling; and never

climbing ladders/ropes/scaffolds.  Tr. 74.  Dr. Lewis also opined that Londo should avoid all

exposure to hazards.  Tr. 74.

Upon reconsideration, on December 12, 2012, state agency reviewing physician William Bolz, M.D., reached a physical RFC assessment similar to that of Dr. Lewis (Tr. 88-89) except Dr. Bolz also found that Londo would be limited to frequent bilateral fingering with hands due to hyperextension deformity (Tr. 89).

### C. Testimonial Evidence

### 1. Plaintiff's Testimony[9]

Londo was represented by a non-attorney representative, Robert Edwards, and testified at the administrative hearing. Tr. 38-57, 59-60, 209. Londo indicated that, as of November 11, 2011, her amended alleged onset date, she could no longer perform her job duties and therefore stopped working. Tr. 38-39. Londo feels she is unable to work because she did a lot of squatting and bending in her job. Tr. 47. She had to use a stepladder to reach on the top of the cars that she was stripping. Tr. 47. She was around paint fumes in the body shop, which causes shortness of breath. Tr. 47. She has to use an inhaler. Tr. 47. Also, she has constant pain in her back and her legs are weak. Tr. 47.

Londo sees her doctor approximately every three months for her back pain and to get medication refills.[10] Tr. 40-41. She has not had surgery, injections, or used any type of back brace.[11] Tr. 41. She has not done physical therapy because she was advised it would not help. Tr. 41. A chiropractor had tried using a TENS unit on Londo but it did not provide relief.[12] Tr. 41.

---

[9] At times during the hearing, Londo alternated between standing and sitting. Tr. 46-47.

[10] Londo's medications included Xanax, Zomig, Vicodin, and use of an inhaler. Tr. 42.

[11] In contrast to her hearing testimony, in a Function Report completed on July 27, 2012, Londo reported that, although not prescribed, she was using a back brace about once per week. Tr. 288.

[12] Londo indicated that the chiropractor that she sees only treats her neck. Tr. 53. He does not want to touch her back because of the bone protruding out of her back. Tr. 53.

During a typical day, Londo does minimal chores in between periods of rest.  Tr. 41-42.  She can only be up doing things or walking around for about 10 to 15 minutes.  Tr. 41-42.  After those short periods of activity, she has to lie down and rest because her back and hips start to hurt.  Tr. 42.  When her pain gets too bad, she takes pain medication and just lies down.  Tr. 42.

Londo described her pain as constant in her lower back with the pain going into her hips and legs.  Tr. 46.  She has a tingling sensation.  Tr. 46.  Also, her knees are weak and her fingertips and toes have started to feel as though they are frostbitten.  Tr. 46.

Londo can stand for about a half hour before her back and hips start hurting and she starts to get pain down her leg and her toes and fingers starts to go numb.  Tr. 53.  When she walks her knees start to hurt.  Tr. 53-54.  She estimated that she would have to stop and rest after about 25 yards due to pain and shortness of breath.  Tr. 54.  Londo also has a hard time sitting because of her lower back and hip pain.  Tr. 54-55.

Londo's pain affects her ability to focus and concentrate.  Tr. 55.  She is forgetful.  Tr. 55.  For example, she will put a pot of water on for tea and forget about it.  Tr. 55.  She watches or listens to television a lot, primarily for background noise.  Tr. 55-56.

Initially, one surgeon did not recommend surgery and explained that the surgery would be invasive.  Tr. 51-52.  A second surgeon recommended a surgical fusion at L4-L5.  Tr. 52.  Londo did not proceed with surgery.  Tr. 52.  She felt more comfortable with the first surgeon and his opinion.  Tr. 52.  Londo had also contacted Laser Spine and sent them her records for their review.  Tr. 52-53.  Laser Spine advised her that they could not help her and explained that any surgery would be very invasive and recommended that she get more than one or two opinions if she was going to proceed with surgery.  Tr. 53.

14

In addition to her back pain, Londo gets a migraine headache about once a month that lasts for a couple days.  Tr. 42.  She takes Zomig for her migraines.  Tr. 42.  She also has had a positive rheumatoid arthritis test.  Tr. 56.  The rheumatoid arthritis causes Londo problems with her hands – her joints are swollen and her fingers are crooked.  Tr. 56.

Londo indicated that she no longer has any hobbies.  Tr. 42.  She used to enjoy woodworking, and refinishing furniture and working in the garden.  Tr. 42-43.  Londo does some light cooking, e.g., toast, soup, and sandwiches.  Tr. 43.  She loads the dishwasher and can do a load of laundry.  Tr. 43.  Her husband does the vacuuming, lawn work, and pays the bills.  Tr. 43.  She does not go to church and does not volunteer anywhere.  Tr. 44.  She does not fish.  Tr. 44.  She has no pets to take care of.  Tr.  44.  She has one friend that comes over to visit.  Tr. 44.  Otherwise, she really has no friends.  Tr. 44.  Her husband does most of the grocery shopping but she will go out every three days or so to go to the store to pick up a few items.  Tr. 44.  She can drive but does not drive often because she does not like to turn her head due to problems with her neck.  Tr. 44-45.  Londo is ok with normal reaching forward and to the side but has problems with overhead reaching because it pulls on her arms and neck.  Tr. 45.  It has been harder for her to handle and do things with her hands such as opening jars.  Tr. 45-46.  Londo indicated she could perform fine manipulation tasks such as separating nuts and bolts into separate piles but after a while her hands would get sore and stiff.  Tr. 46.

### 2.    Vocational Expert's Testimony

Vocational Expert George W. Coleman, III, ("VE") testified at the hearing.  Tr. 57-64.  The VE described Londo's past work as a hospital cleaner as an unskilled, medium level position, and her work as a decal applier as an unskilled, light level position that Londo performed at the light to medium level.  Tr. 57-58.

The ALJ asked the VE to assume a hypothetical individual who is the same age as Londo and who has the same education and past job experience as Londo who can perform light work with a sit/stand option allowing for a change in positions after 30 minutes; never climbing ladders, ropes, or scaffolds; frequent climbing ramps or stairs; occasional stooping, kneeling, crouching, and crawling; frequent fingering; avoidance of all use of hazardous machinery; avoidance of exposure to unprotected heights; goal-based work, measured by end result not pace work; absent one day per month; and off-task 5% of the day.  Tr. 58-59.  The VE indicated that the described individual would be unable to perform Londo's past work.[13]  Tr. 59-61.  The VE indicated, however, that the described individual would be able to perform other work, including (1) storage facility rental clerk, an unskilled, light level position with 467 positions available regionally and 74,037 nationally; (2) car wash attendant, an unskilled, light level position with 324 positions available regionally and 66,029 nationally; and (3) parking lot attendant, an unskilled light level position with 270 positions available regionally and 35,525 nationally.  Tr. 61.

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical with the exception that the described individual would be limited to sedentary rather than light work. Tr. 61-62.  The VE indicated that Londo's past jobs would be excluded and there were no transferable skills.  Tr. 62.  The ALJ next asked the VE to consider the individual described in the first hypothetical except that instead of being off-task 5% of the workday, the individual would be off-task 15% of the workday due to pain causing a lack of focus.  Tr.  62.  The VE indicated that the previously identified jobs would not be available and the VE did not believe

---

[13] At first, the VE indicated that the described individual would be able to perform Londo's past work as a decal applier.  Tr. 59.  However, following further discussion regarding Londo's use of a stepladder to apply decals to the roofs of cars, the VE indicated that neither the hospital cleaner nor decal applier position would be available to the described individual.  Tr. 59-61.

that competitive work opportunities would be available to the individual because 15% would exceed the standard for being off-task in the unskilled work setting. Tr. 62-63.

The VE also indicated that, if the hypothetical individual described in the first hypothetical was absent two days per month due to migraines and back pain, competitive work opportunities would not be available to the individual. Tr. 63. Also, according to the VE, adding four-15 minutes breaks in addition to regularly scheduled breaks to the first hypothetical would preclude work. Tr. 63. If handling and fingering in the first hypothetical was reduced to occasional, the VE indicated that such a restriction would affect the availability of jobs. Tr. 63-64. If the individual in the first hypothetical needed to avoid concentrated exposure to irritants such as fumes, odors, dust and gases, the VE indicated that the individual would not be able to perform Londo's past work but the other jobs identified would remain. Tr. 64.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his July 16, 2014, decision, the ALJ made the following findings:[14]

---

[14] The ALJ's findings are summarized.

1.    Londo met the insured status requirements through June 30, 2015.  Tr. 17.

2.    Londo had not engaged in substantial gainful activity since November 11, 2011, Londo's amended alleged onset date.  Tr. 17.

3.    Londo had the following severe impairments: migraine headaches, degenerative disease of her cervical and lumbosacral spine, hyperextension deformity of the fingers of her hands, and arthritis.[15]  Tr. 17-19.

4.    Londo did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 20.

5.    Londo had the RFC to perform light work, consistent with an ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours in a workday, sit for six hours in a workday with an option to change sit and stand positions after 30 minutes, frequently climb ramps and stairs, occasionally stoop, kneel, crouch, and crawl, and frequently finger (i.e., finely manipulate with the hands).  She could work in jobs that would not require her to use hazardous machinery or work at unprotected heights; would require goal-based production/work measured by the end result, not pace work; would be absent from work up to one day a month and would be off task up to five percent of the workday.  Tr. 20-26.

6.    Londo was unable to perform her past relevant work.  Tr. 26.

7.    Londo was born in 1961 and was 52 years old, and defined as an individual closely approaching advanced age.  Tr. 26.

8.    Londo had at least a high school education and was able to communicate in English.  Tr. 26.

9.    Transferability of job skills was not material to the determination of disability.  Tr. 26.

10.   Considering Londo's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Londo could perform, including storage facilities rental clerk, car wash attendant, and parking lot attendant.  Tr. 26-27.

---

[15] The ALJ found other impairments, including anxiety, to be non-severe impairments.  Tr. 18-19.  Londo does not challenge the ALJ's Step Two finding that certain impairments were non-severe.

Based on the foregoing, the ALJ determined that Londo had not been under a disability from November 11, 2011, through the date of the decision.  Tr. 27.

## V. Parties' Arguments

The crux of Londo's argument is that ALJ Wang's unfavorable July 16, 2014, decision should be reversed because it conflicts with ALJ Wallis's earlier fully favorable July 2, 2013, decision.  Doc. 20.  She contends that the evidence, including records showing that her "vertebrae [has been] completely popped out of her spine," supports ALJ Wallis's sedentary RFC.  Doc. 20.  She argues that ALJ Wang did not properly consider the medical opinion evidence, erroneously assessed her RFC, and erroneously concluded that Londo was able to perform her past relevant work.[16]  Doc. 20, pp. 11-14.

In response, the Commissioner argues that substantial evidence supports the ALJ Wang's RFC assessment.  Doc. 13, pp. 9-15.  The Commissioner contends that ALJ Wang's thorough and reasonable analysis of the objective and subjective record evidence, opinion evidence, and Londo's credibility demonstrates that the decision is supported by substantial evidence.  Doc. 23, pp. 7-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

---

[16] As discussed below, ALJ Wang actually reached a contrary conclusion, i.e., that Londo was not able to perform her past work.  Tr. 26.  Londo also appears to argue that the ALJ failed to fully and fairly develop the record, arguing that a special duty is imposed on an ALJ to explore all relevant facts where a claimant is unrepresented. Doc. 20, p. 14.  Londo was represented at the hearing conducted by ALJ Wang, albeit by a non-attorney representative.  Tr. 37, 209.  Thus, there was no heightened duty imposed upon ALJ Wang.

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

### A. ALJ Wang's decision was not issued improperly and is not subject to reversal on the basis that it conflicts with ALJ Wallis's earlier favorable decision.

Londo's claim that ALJ Wang improperly issued a decision or that his July 16, 2014, unfavorable decision is subject to reversal because it conflicts with ALJ Wallis's prior favorable decision is without merit.

In ALJ Wallis's July 2, 2013, Notice of Decision – Fully Favorable, Londo was advised that the Appeals Council could review ALJ Wallis's decision on its own motion.  Tr. 96.  On August 30, 2013, consistent with that notice and pursuant to its authority to so under the Regulations, the Appeals Council initiated review of ALJ Wallis's July 2, 2013, fully favorable decision.  *See* 20 C.F.R. § 404.969(a) ("General.  Anytime within 60 days after the date of a decision or dismissal that is subject to review under this section, the Appeals Council may decide

on its own motion to review the action that was taken in your case.").  Further, in accordance with the Regulations, the Appeals Council provided notice to Londo of its decision to review ALJ Wallis's July 2, 2013, decision.  Tr. 167-172; *see* 20 C.F.R. §§ 404.973; 404.969(d) (notice provisions when Appeals Council reviews a decision).

Following its review, on February 26, 2014, the Appeals Council vacated the July 2, 2013, decision and remanded the case to an Administrative Law Judge for further proceedings. Tr. 104-110; *see* 20 C.R.F. § 404.979 (authorizing the Appeals Council to remand a case). Thereafter, on May 30, 2014, ALJ Wang conducted a hearing (Tr. 35-65) and issued his decision on July 16, 2014, finding that Londo had not been under a disability within the meaning of the Social Security Act from November 11, 2011, through July 16, 2014, the date of the decision (Tr. 12-34).

Londo has failed to show that ALJ Wang's decision was issued without authority or not issued in accordance with applicable law.  Moreover, ALJ Wallis's earlier decision was vacated. Thus, it is ALJ Wang's decision that is the final decision subject to review by this Court and ALJ Wang's decision is not subject to reversal because it conflicts with ALJ Wallis's earlier decision. Rather, the issue for this reviewing Court is whether ALJ Wang's decision is supported by substantial evidence.

**B.  ALJ Wang's RFC is supported by substantial evidence.**

Londo claims that the evidence does not support ALJ Wang's finding that she has the RFC to perform a reduced range of light work.  Doc. 20.  In support, she relies upon MRI findings and opinions/statements offered by her treating physicians, Dr. Shelly and Dr. Hanna. Doc. 20 (citing to Tr. 320, 324, 399, 402).  Londo appears to contend that, like ALJ Wallis, ALJ Wang should have provided only little weight to the opinions offered by the state agency

reviewing physicians and more weight to the opinion of other physicians, specifically, Dr. Shelly.[17]  Doc. 20.

ALJ Wang considered in detail the medical evidence, including MRI findings and evidence from treating source providers, regarding Londo's back impairment and found that one of Londo's severe impairments was degenerative disease of her cervical and lumbosacral spine. Tr. 17-19.  Thus, any contention by Londo that the ALJ failed to consider certain evidence is without merit.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

---

[17] In making her arguments, Londo incorrectly states that Dr. Shelly provided a "State Medical Opinion." *See e.g.,* Doc. 20, p. 3.  Dr. Shelly was her treating physician, not a state agency reviewing physician.  The state agency reviewing physician opinions were rendered by Elaine Lewis, M.D., and William Bolz, M.D. Tr. 73-75, 88-90.

After discussing the details of Londo's medical records and her complaints regarding the severity of her symptoms, the ALJ considered and weighed the medical opinion evidence.  With respect to Dr. Shelly, ALJ Wang stated:

> In July 2012, Dr. Shelly observed that the claimant had pain in her neck with motor loss weakness and opined that the claimant would be unable to do heavy labor and probably should not do work that required her to stand all day but could do office work (Exhibit 3F).   Dr. Shelly noted that the claimant "actually functions surprisingly well and has so all her life for the degree of deformity in her back," though she also noted the "potential for disability is very great" (Exhibit 3F at 2).  Dr. Shelly noted that the claimant's hands and arms were fine, that her motor loss was not that great, and that she had only mild weakness.  Dr. Shelly concluded that the claimant did not have severe symptoms, only the potential for more severe symptoms.  I give some weight to the assessment of Dr. Shelly, as her comments are generally consistent with the abilities assessed in the above-enumerated residual functional capacity assessment.  However, I do not give the assessment great weight, as it does not provide specific-work related abilities or limitations.

Tr. 23.

Other than arguing that ALJ Wang should have given more weight to Dr. Shelly's opinion because ALJ Wallis did so, Londo points to no specific error with respect to ALJ Wang's consideration of and explanation of the weight provided to Dr. Shelly's opinion.  Moreover, Londo's contention that Dr. Shelly's opinion supports an RFC that is more restrictive than that assessed by ALJ Wang is unpersuasive.  ALJ Wang's RFC restricts Londo to light work with a an option to change sit and stand positions after 30 minutes.  Tr.  20.  This RFC restriction is not inconsistent with Dr. Shelly's own assessment that Londo "probably shouldn't do work where she stands all day."  Tr. 326.  Nor has Londo shown that ALJ Wang's RFC assessment is inconsistent with Dr. Shelly's opinion that Londo could not do "heavy labor" but could do office work.  Tr. 326.

Based on the foregoing, the undersigned finds no error with respect to ALJ Wang's consideration of the evidence regarding Londo's back impairment or with respect to ALJ Wang's consideration of and weighing of Dr. Shelly's opinion.[18]

ALJ Wang's RFC restricting Londo to a reduced range of light level work is supported by other opinion evidence and Londo has failed to show that ALJ Wang erred in his consideration of the opinion evidence.  For example, Dr. Onamusi opined that Londo would "have difficulty engaging in more than sedentary *to light physical* demand level activities. . ." Tr.  363 (emphasis supplied).  ALJ Wang gave some weight to this opinion.  Tr. 23.  Londo has failed to show that ALJ Wang improperly considered or weighed Dr. Onamusi's opinion or that Dr. Onamusi's opinion is inconsistent with or fails to support ALJ Wang's RFC restricting Londo to a reduced range of light exertional work.  Tr. 23.   Additionally, ALJ Wang considered and provided great weight to the state agency reviewing physicians' opinions.  Tr. 23.  Both Dr. Lewis and Dr. Bolz concluded that Londo would have the RFC to perform light work with some restrictions.  Tr. 23, 74-75, 88-90.  In addition to limitations contained in the state agency reviewing opinions, ALJ Wang provided further restrictions beyond those included in the opinions of Drs. Lewis and Bolz.  Tr. 23 (e.g., adding an off-task and absenteeism restriction due to migraines and loss of focus because of pain).  Londo claims that ALJ Wang should have provided the state agency reviewing opinions less weight because the evidence shows that her condition deteriorated following their review of her records.  However, the ALJ considered all the evidence, including evidence received after the state agency reviewers conducted their

---

[18] ALJ Wang did not accept Dr. Hanna's April 2014 assessment, finding it inconsistent with objective findings of record and inconsistent with Londo's reported daily activities.  Tr. 24.  Londo has not argued nor shown error with respect to the ALJ's evaluation of Dr. Hanna's April 2014 assessment.  Moreover, Dr. Hanna's support for Londo's disability filing or any opinion that Londo is unable to work is an assessment on an issue reserved to the Commissioner and not entitled to deference.  *See* 20 C.F.R. § 404.1527(d).

assessments, and Londo has failed to show error with respect to ALJ Wang's consideration of that evidence.

Additionally, Londo has failed to demonstrate that the RFC restricting her to a reduced range of light work is not supported by substantial evidence in the record, including, for example, opinions offered by Londo's own treating physicians, e.g., Dr. Shelly stated that, Londo "really doesn't have severe [symptoms] – just the potential for [symptoms]." Tr. 326. Consultative examining physician Dr. Onamusi did not limit Londo to sedentary work.  Rather, he opined that Londo would "have difficulty engaging in more than sedentary *to light* physical demand level activities . . . "  Tr. 363 (emphasis supplied).  Also, as observed by ALJ Wang, Londo's treatment has been periodic and conservative.  Tr. 26.  For example, Londo's own treating physician, Dr. Hanna, encouraged Londo to accept evaluation and surgical intervention regarding her back pain but Londo refused.  Tr. 389.  Additionally, while Londo had some abnormal objective examination findings, as detailed in ALJ Wang's decision, the objective examination findings were generally normal.  Tr. 24 (detailing treating and examining physicians' objective examination findings).

In consideration of the foregoing, the undersigned finds that ALJ Wang properly evaluated and weighed the medical evidence, including the medical opinion evidence, and his decision is supported by substantial evidence.

### C.  The ALJ found that Londo could not perform her past work.  Londo's claim to the contrary is baseless.

Londo argues that ALJ Wang erroneously concluded that she could perform her past work as a hospital worker and decal installer.  Doc. 20, p. 11.  However, ALJ Wang did <u>not</u> conclude that Londo could perform her past work as a hospital worker and decal installer.  *See*

Tr. 26 (Finding 6 – "The claimant is unable to perform her past relevant work.").   Thus, her argument is without merit.

In consideration of the foregoing, the undersigned finds no basis upon which to recommend reversal of the Commissioner's decision.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

 Dated:  June 13, 2016

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).